## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 27 2018, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long &
Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

K.D. (Minor Child)

and

K.H. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

March 27, 2018

Court of Appeals Case No. 03A04-1709-JT-2135

Appeal from the Bartholomew Circuit Court

The Honorable Heather Mollo, Magistrate

The Honorable Kelly Benjamin, Judge

Trial Court Cause No. 03C01-1701-JT-587

**Vaidik, Chief Judge.**

# Case Summary

K.H. ("Father") appeals the termination of his parental rights to his son. Finding no error, we affirm.

# Facts and Procedural History

Father and J.D. ("Mother") are the parents of K.D. ("Child"), who was born February 1, 2016.[1] Mother has another child, W.H., who was born in October 2001. On the day of Child's birth, the Indiana Department of Child Services (DCS) received a report that Mother was addicted to opiates and benzodiazepines during her pregnancy with Child, Child showed signs of withdrawal after birth (and was in the NICU receiving treatment for withdrawal), and Father had been arrested two days earlier and charged with attempted murder and battery by means of a deadly weapon for shooting two people (W.H., age fourteen, was present during the shootings) and was in the Bartholomew County Jail. Based on these allegations, DCS requested an emergency order to remove Child from Mother, which the juvenile court granted on February 4. After being discharged from the hospital, Child was placed with K.B., Mother's cousin. When Child was placed with K.B., he had a "high level of need," "was still going through withdrawals," and "could not

---

[1] Mother signed a consent for Child to be adopted and, as such, is not a party to this appeal.

soothe himself." Appellant's App. Vol. II p. 10. Child has been with K.B. ever since.

[3] On February 8, DCS filed a petition alleging that Child was in need of services (CHINS) based on the same allegations. A fact-finding hearing was held in April, and Mother and Father, who was still in jail, admitted that Child was a CHINS. In particular, Father agreed (1) that he was unavailable to care for Child due to his incarceration and (2) that the circumstances outlined in the CHINS petition (including that he was facing charges for shooting two people and that W.H. was present during the shootings) were "concerning for the safety of his son." Ex. 6. The juvenile court adjudicated Child a CHINS. The parties reached an agreement as to services, and the court issued a dispositional decree that specified Father would, among other things, participate in Fatherhood Engagement and follow all recommendations and keep DCS informed about his criminal case. *Id.* The permanency plan at the time was reunification.

[4] A guardian ad litem (GAL) was appointed in July. At an October status hearing, evidence was presented that Child was receiving occupational therapy through First Steps, was progressing well with K.B., was meeting all developmental milestones, and was "content" and "happy." Ex. 8. A representative from Fatherhood Engagement reported that Father was "very engaged" in the program and had asked about having visits with Child at the Bartholomew County Jail. *Id.* The GAL testified, however, that it would be "best" to postpone any visits between Father and Child until Father's criminal

case was resolved and it was known "how soon he might be free from confinement." *Id.* The GAL reasoned that Child was approximately eight months old and was "moving into a stage where bonds are strongly formed." *Id.* Accordingly, to introduce someone unknown to Child, without the opportunity for regular contact, "could prove unsettling and confusing" to Child. *Id.* The juvenile court agreed with the GAL and withheld visitation until there was "a clearer understanding of [Father's] long-term living arrangements." *Id.* The court scheduled a permanency hearing for January 2017 and appointed counsel for Father.

[5] In the meantime, Father, represented by counsel, moved for visitation with Child, and a hearing was held on December 6. At that time, there was the potential that Father "could be incarcerated for a significant period of time." Ex. 9. DCS talked to Captain Martoccia at the Bartholomew County Jail, who said that visitation between inmates and small children was "discouraged" and that visitation was by video conference only (no personal contact). DCS opposed visitation, because it was unknown how Child would react to a new, strange environment. Accordingly, DCS recommended "postponing discussions regarding visitation . . . until [Father] has resolved his criminal matters and there is an identified release date." *Id.* The GAL concurred with DCS and added that Child "is very attached to his placement, and is very [leery] of new places and people." *Id.* Furthermore, the GAL was concerned that Child would "not feel safe or secure in the jail environment." *Id.* The GAL also recommended postponing visits until the length of Father's

incarceration was known. In short, the GAL did not believe that "the benefit to the father these visits would provide, is worth the risk to the child." *Id.* Moreover, K.B. was unwilling to take Child to the jail to visit Father. The juvenile court, acknowledging that Father could be incarcerated "for a significant period of time," denied Father's request to visit Child. *Id.* The court reasoned that Child was not familiar with Father and that there was uncertainty regarding the length of Father's sentence.

[6] About a week later, on December 14, Father pled guilty to two counts of Level 5 felony battery by means of a deadly weapon. He was later sentenced to three years in prison on each count, to be served consecutively, for a total of six years.

[7] The permanency hearing was held in January 2017. Evidence was presented regarding the resolution of Father's criminal case, including that his earliest possible release date was July 2020.[2] Evidence was also presented that Child, who at that time had been with K.B. for eleven months, was "healthy and happy," progressing well, and "very bonded" to her. Ex. 10. In addition, Mother had signed a consent for K.B. to adopt Child. The permanency plan was changed to adoption.

---

[2] DOC's Offender Search shows that Father's projected release date is now January 2020. *See* http://www.in.gov/apps/indcorrection/ofs/ofs (last visited Mar. 15, 2018).

[8]     On January 31, DCS filed a petition to terminate Father's parental rights to Child. Two weeks later, Father was transferred from the Bartholomew County Jail to the Department of Correction (Branchville Correctional Facility) to serve his sentence.

[9]     An evidentiary hearing was held in May. Several witnesses testified, including Mother, a former girlfriend of Father, Father's caseworker at Branchville Correctional Facility, K.B., the DCS family case manager, and the GAL.

[10]    Mother testified about her three-year relationship with Father. Specifically, she testified that Father had physically and mentally abused her, including "pull[ing]" her down a flight of stairs, holding a gun to her head, and choking her when she was eight months pregnant with Child. Tr. Vol. II p. 12. Mother opined that K.B. should adopt Child:

> I believe [Child] should stay where he's at. [Child] goes to therapy with [K.B.], he is very well taken care of. She pays for day care, she does all the doctor's visits and . . . she has a relationship with my son, and so does the family.

*Id.* at 13.

[11]    M.H., Father's former girlfriend, testified about her eighteen-month relationship with him. Specifically, M.H. "ha[s] a child with him," E.H., who was five years old at the time of the hearing. *Id.* at 33. M.H. said that Father had "very little" contact with E.H., including "none" in the last three years. *Id.* at 34. M.H. described her relationship with Father as "[r]ocky" and testified

about an incident in June 2012 where Father was arrested for choking her. *Id.* at 33. M.H. said that Father had a "drinking problem" and a "marijuana substance issue." *Id.* at 34.

[12] Father's caseworker from Branchville Correctional Facility testified about the DOC programs available to him. According to the caseworker, Father was only enrolled in a literacy program at the time. Because Father did not have a GED or an 8th grade reading level, he was ineligible for most programs that awarded time cuts. Nevertheless, Father had requested to enroll in Inside Out Dads (which teaches parenting skills), but he had not yet received confirmation.

[13] K.B. testified that Child was "doing very well" since he had been placed with her. *Id.* at 48. Child no longer had symptoms of withdrawal and was doing occupational therapy with First Steps. Although Child had an eating/sensory disorder, K.B. was taking him to see "numerous doctors." *Id.*

[14] K.B. also testified about Father's efforts to stay informed about Child. When Father was in the Bartholomew County Jail, K.B. "opened up a phone account" and put money in it so that Father could call her about Child. *Id.* at 50. K.B. also sent Father letters and photos of Child (which he then inexplicably sent to M.H., who has no relation to Child). K.B. said that Father called her "a few times," and although Father would "sometimes" ask about Child, he "very quickly want[ed] to turn the conversation [to Mother]." *Id.* at 51. That is, Father wanted to know "what [Mother] was doing" and "who she was running with." *Id.* at 53. K.B. said that Father had sent her "two letters."

*Id.* at 52. In one of the letters, Father said that he wanted his family to be involved with Child, which K.B. agreed to. However, he never asked about Child's health in either letter. K.B. testified that she did not hear anything from Father between October 2016 and April 2017. When asked if she had concerns about Child being placed with Father, K.B. answered:

> [Father] has not shown that he is truly, I mean I paid money, I didn't have to do that, for a card for him to call to check on [Child], on his condition and how he was doing, and he was so concerned about his family being involved, and I have not heard from his family except through a Facebook from his mother in Trinidad, a few times.

*Id.* at 55. K.B. was also concerned about Father's "drug[]" use, that Child did not know Father, that Father had a "temper," that Father did not have a relationship with his other child, and that Father was in prison for a violent crime. *Id.* at 55-56.

[15] The DCS family case manager testified that Father started participating in Fatherhood Engagement in August 2016 when he was in the Bartholomew County Jail; however, that program was no longer available when he was transferred to the DOC in February 2017. The family case manager testified about other programs that were available to Father when he was in the Bartholomew County Jail, such as Providing Opportunities for Parental Success (POPS), Bible study, Celebrate Recovery, and AA/NA meetings; however, Father did not take advantage of any of them. When asked if Father had ever asked her how Child was doing, the family case manager responded:

There have been several conversations with [Father] where he will ask in general, how [Child] is doing, but never really specifics regarding his recovery from a surgery, or specifics related to how [Child], whether or not [Child] is meeting his developmental milestones.

*Id.* at 60. And when asked if she had any concerns if Child was placed with Father, the family case manager said:

[Child] does not know any other parent, other than [K.B.] and [her boyfriend]. He is very clearly bonded with them. He looks to them for comfort and love. By placing [Child] in a home with a complete stranger, after being raised for four years, essentially five years with [K.B.] and [her boyfriend], it would be very confusing for [Child], very traumatizing. And due to the fact that [Father's] been incarcerated since [Child's] birth, we're not sure what Father's level of need is. The Department is aware that he is incarcerated for a very violent crime, that he has a son that, prior to [Child], that he was not really involved in his care nor his life, that he's been physically violent in front of another child, as witnessed by the Department's involvement, and that he's been physically aggressive with two girlfriends.

*Id.* at 61. The family case manager stressed that placing Child with Father could be harmful:

Based on the reason, again for the Department's involvement with [Father] shooting the two people in front of another child . . . and initially [Father] was facing Attempted Murder charges. He ple[d] down to his current charges, it has been noted that [Father] has a history of being physically violent towards women in past relationships. . . . [Child] does not know [Father], he's a complete stranger to him. And again, [Child] is very physically, visibly bonded with [his] current placement, and taking him

away from [K.B.] and [her boyfriend] would be, again very traumatizing for him.

*Id.* at 62. Accordingly, the family case manager said that the plan for Child was adoption.

[16] Finally, the GAL testified that Child had made "[t]remendous progress" since being placed with K.B. and had overcome "many of the effects . . . of the substances that he was exposed to while in the womb." *Id.* at 67. When asked if the case should be kept open until 2020, when Father was set to be released from prison, the GAL responded:

> [Father] is only connected with this child biologically. This child, I can tell by my visits and my observations, of his interactions with the foster family, he considers, even at this young age of fifteen months, [K.B.] to be his mother and her [boyfriend] to be his father. It is my opinion that to delay permanency for this child and delay adoption, would be cruel to the child. It would be emotionally cruel to re-unite him, after the age, which would be four or older. And I think because of the criminal history that we are dealing with in terms of [Father], and the lack of stability that we're dealing with in his home, that this reunification would be potentially dangerous to [the child].

*Id.* at 67-68. Accordingly, the GAL testified that it was in Child's best interests for Father's parental rights to be terminated and for K.B. to adopt Child.

[17] After the hearing, the juvenile court issued an order in August 2017 granting DCS's petition, reaching the following conclusions under the termination statute, Indiana Code section 31-35-2-4: (1) Child has been removed from

Father for at least six months under a dispositional decree; (2) there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied and[3] that continuation of the parent-child relationship poses a threat to the well-being of Child; (3) termination is in the best interests of Child; and (4) the plan of adoption for Child is satisfactory.

[18] Father now appeals.

# Discussion and Decision

[19] In a termination case, the juvenile court must make conclusions regarding the allegations in the termination petition, and it must enter findings of fact in support of those conclusions. Ind. Code § 31-35-2-8(c). When the losing party appeals, the role of the appellate court is to determine whether the evidence supports the findings and whether the findings support the conclusions. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We will set aside a termination judgment only if it is clearly erroneous. *Id.*

[20] Here, Father does not challenge the juvenile court's first and last conclusions: that Child has been removed from him for at least six months under a dispositional decree and that the plan of adoption is satisfactory. Therefore, we

---

[3] The juvenile court's termination order uses "or," but it is clear from the termination hearing that the court meant "and." *See* Tr. Vol. II p. 84.

need only decide whether the juvenile court's findings[4] support its conclusions that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied and that termination is in the best interests of Child. We hold that they do.[5]

[21] The juvenile court engages in a two-step analysis to determine whether the conditions that led to the child's placement outside the home will not be remedied. First, the court ascertains what conditions led to the child's

---

[4] Father challenges some of the juvenile court's fifty-three findings. First, Father challenges Finding No. 20 and a portion of Finding No. 29, which note that Father "may" be facing deportation to Trinidad. Even disregarding Father's immigration status, we find that the unchallenged findings are sufficient to support the termination of his parental rights.

Second, Father challenges a portion of Finding No. 35, which states that M.H. "had a child with [F]ather." Father argues that there is no evidence that "paternity of that child was ever established." Appellant's Br. p. 25. It is true that paternity was not established at the time of the hearing. However, M.H. testified that Father was E.H.'s father, that E.H. had Father's last name, that she and Father were together when E.H. was born, and that she encouraged contact between them but Father had "very little" contact with E.H., including "none" in the last three years. Based on this evidence, the court acted within its discretion in finding that Father was E.H.'s father.

Third, Father challenges Finding No. 30: "Putting aside Father's unavailability due to incarceration, he does pose a safety risk to the Child. The recent criminal convictions warrant further understanding as to how and why Father shot two people and did so in the presence of Mother's older daughter, who was fourteen years old at the time." However, Father himself admitted during the CHINS proceeding that the fact that he shot two people in the presence of fourteen-year-old W.H. was "concerning for the safety of [Child]." Ex. 6. The evidence supports this finding.

Finally, Father appears to argue that the court's findings are insufficient because there is no "clear connection" to the "judgment." Appellant's Br. p. 12. We find that court's findings sufficiently support its conclusions. *See* I.C. 31-35-2-8(c) ("The court shall enter findings of fact that support the entry of the conclusions . . . .").

[5] Because we affirm the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010) ("We first observe that [Indiana Code] section 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus DCS was required to prove by clear and convincing evidence only one of the two requirements of subsection (B).").

placement outside the home. Second, the court determines whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, the court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

[22] Here, the conditions that led to Child's placement and retention with K.B. were (as admitted by Father himself at the CHINS fact-finding hearing): (1) Father's unavailability due to his incarceration and (2) the fact that he shot two people in the presence of fourteen-year-old W.H. was "concerning for the safety of [Child]." Ex. 6; *see also* Tr. Vol. II p. 28 (DCS assessment worker: "Father admitted to me that he had shot two people, so that was very concerning . . . [i]n regards to how he would be able to keep his son safe."). Although Father's incarceration will end in 2020, at which point he will be available to parent, the fact remains that he shot two people in the presence of a child. This makes his parenting skills highly questionable, especially considering that Father was not involved in the life of his other son, was more concerned about Mother than Child when he was in jail, and did not ask K.B. or the family case manager about Child's health (Findings 21, 22, and 45). As to whether there is a reasonable probability that these conditions will not be remedied, as the juvenile court found, Father has a "history of domestic violence perpetrated . . . in other intimate relationships," including choking M.H., putting a gun to Mother's head, and choking Mother when she was eight months pregnant with

Child (Findings 31, 33, and 36). Given Father's lack of interest in Child and propensity for violence, the juvenile court did not err when it concluded that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied.

[23] In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009), *reh'g denied*. Further, the testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[24] DCS presented evidence that Father's rights should be terminated because of Child's need for permanency. Two days before Child was born, Father shot two people in the presence of another child and has been incarcerated ever since. Following Child's release from the hospital, Child was placed with a

relative, K.B., with whom Child has bonded and made "tremendous developmental strides." Appellant's App. Vol. II p. 10 (Finding 47). While Father was in the Bartholomew County Jail, K.B. put money in an account so that Father could call her about Child. Father called her a "few" times, but he was more concerned about who Mother was running around with than he was with Child's health and progress. K.B. also sent Father photos of Child, but Father inexplicably sent them to M.H. instead of keeping them for himself. Father sent K.B. two letters, but, as the juvenile court found, they were "accusatory" and "did not inquire as to the Child's health condition." *Id.* at 8 (Finding 22). In addition, K.B. did not hear anything from Father between October 2016 and April 2017. In short, Father showed a low level of interest in Child when he should have been doing everything in his power to show his dedication to obtaining reunification with Child. For this reason, the GAL testified that Father was only connected to Child "biologically" and that it was in Child's best interests for Father's parental rights to be terminated and for K.B. to adopt Child.

[25] Nevertheless, Father claims he is similar to the father in *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641 (Ind. 2015). In that case, the father was incarcerated for drug offenses when his child was born, and there was "seemingly nothing else that [the father] could have been doing to demonstrate his dedication to obtaining reunification" with his child: the father had completed twelve programs while incarcerated (the majority of which were voluntary and did not result in sentence reduction), a family member regularly

brought his child to visit him in prison, and he spoke to his child every night on the phone. *Id.* at 649. Our Supreme Court overturned the termination of the father's parental rights. Setting aside the fact that Father is in prison for shooting two people in the presence of a child, there is substantially more that Father could have done while incarcerated to demonstrate his dedication to obtaining reunification with Child. This includes, at a bare minimum, regularly keeping apprised of Child's health and progress. The juvenile court did not err in concluding that termination is in Child's best interests.[6]

[26] Affirmed.

May, J., and Altice, J., concur.

---

[6] Father also argues that DCS refused to let him visit Child and that this was a violation of Indiana Code section 31-34-21-5.5, which requires DCS to make reasonable efforts to preserve and reunify families during CHINS cases. We first note that during the CHINS case here, the parties came to an agreement regarding services, and those services did **not** include visitation. *See* Ex. 6 ("The court now proceeds to a Dispositional Hearing. The parties have reached an agreement as to the necessary services in these matters."). Moreover, the failure to provide services in a CHINS proceeding (here, visitation) is unavailable for review during an appeal following the termination of parental rights. *See In re G.M.*, 71 N.E.3d 898, 906 (Ind. Ct. App. 2017).

If Father wanted to appeal this issue, he should have done so earlier. After the juvenile court entered the dispositional order, Father moved for visitation with Child, and the court denied his request. Indiana Code section 31-34-23-1 allows a parent to move to modify a dispositional decree, which is essentially what Father did when he requested visitation with Child. Father, however, did not appeal the court's denial of his motion.